David I. Pankin, P.C.
48 Willoughby Street
Brooklyn, NY 11201
Telephone: (718) 243-2444
Facsimile: (718) 243-1144

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------x

EASTERN SAVINGS BANK, FSB,

                            Plaintiff,

        -against-

DUNCAN ERIC JONES A/K/A DUNCAN
JONES; LINDA L. KNIGHT; NEW YORK
CITY ENVIRONMENTAL CONTROL
BOARD and "JOHN DOE #1 through JOHN
DOE #6", the last twelve names being fictitious
and unknown to Plaintiff, the persons or parties
intended being the tenants, occupants, persons
or corporations, if any, having or claiming an
interest upon the premises described in the
Complaint,

                        Defendants.

-------------------------------------------------------------------------x

Civil Action No:
15 CV 00420 LTS

**ANSWER**

      The defendants, Duncan Eric Jones a/k/a Duncan Jones (hereinafter referred to as

"Duncan Jones") and Linda L. Knight (hereinafter referred to as "Linda Knight"), by their

attorneys, David I. Pankin, P.C., hereby interpose the following Answer with Affirmative

Defenses to plaintiff's Complaint herein.

**AS AND FOR AN ANSWER TO THE ALLEGATIONS
CONTAINED IN THE CAUSE OF ACTION SET
FORTH WITHIN PLAINTIFF'S COMPLAINT**

1.   Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the paragraph of the Complaint marked "1"; and therefore deny same.

2.   Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the paragraph of the Complaint marked "2"; and therefore deny same.

3.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "3", except to admit that defendant Duncan Jones resides in premises commonly known and designated as 520 West 149th Street, New York, NY 10031.

4.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "4", except to admit that defendant Linda Knight resides in premises commonly known and designated as 520 West 149th Street, New York, NY 10031.

5.   Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the paragraph of the Complaint marked "5"; and therefore deny same.

6.   Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the paragraph of the Complaint marked "6"; and therefore deny same.

7.   Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the paragraph of the Complaint marked "7"; and therefore deny same.

8.   Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the paragraph of the Complaint marked "8"; and therefore deny same.

9.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "9".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

10.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "10".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

11.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "11".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

12.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "12".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

13.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "13".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

14.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "14".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

15.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "15".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

16.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "16".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

17.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "17".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

18.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "18".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

19.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "19".  Defendants further and affirmatively allege that each of the

documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

20.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "20".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

21.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "21".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

22.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "22".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

23.   Defendants deny each and every allegation contained in the paragraph of the Complaint marked "23".  Defendants further and affirmatively allege that each of the documents and instruments specified therein is invalid and unenforceable for the reasons hereafter alleged.

24.   Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations contained in the paragraph of the Complaint marked "24"; and therefore deny same.

**AS AND FOR A FIRST AFFIRMATIVE DEFENSE,
THE DEFENDANTS, DUNCAN JONES AND
<u>LINDA KNIGHT, ALLEGE HEREIN</u>:**

25.   That the plaintiff Eastern Savings Bank, FSB has violated the "Consent Order" previously entered into between plaintiff and the United States of America, Department of the Treasury, Comptroller of the Currency, dated March 31, 2014. Such "Consent Order" is fully applicable to the loan transaction which is the subject of this lawsuit.  A duplicate copy of said "Consent Order" is annexed hereto and made a part hereof as **"Defendant's Exhibit 1"**.

26.   That the plaintiff Eastern Savings Bank, FSB has violated the "Consent Order" previously entered into between plaintiff Eastern Savings Bank, FSB and the United States of America, Department of the Treasury, Comptroller of the Currency, dated March 31, 2014; in that plaintiff has not offered defendants Duncan Jones and Linda Knight with a fair and equitable attempt at a modification of the terms existing in connection with the consumer credit transaction which is the subject of this lawsuit, pursuant to said "Consent Order".

**AS AND FOR A SECOND AFFIRMATIVE DEFENSE,
THE DEFENDANTS, DUNCAN JONES AND
<u>LINDA KNIGHT, ALLEGE HEREIN</u>:**

27.   That the venue of the subject action is improper, as it is in violation of defendants' right to a settlement conference, pursuant to New York State law, including CPLR 3408 which is applicable to the loan transaction which is the subject of this

lawsuit.

28.   That CPLR 3408 directs that in any New York State residential foreclosure action involving a high-cost home loan consummated between January 1, 2003 and September 1, 2008, or a subprime or nontraditional home loan, as those terms are defined in Section 1304 of the New York State Real Property Actions and Proceedings Law (RAPL), in which a defendant is a resident of a property subject to a foreclosure action, the court shall hold a mandatory conference within sixty days after the date when proof of service is filed with the county clerk.  Such conference is to be held, pursuant to CPLR 3408(a), *"for the purpose of holding settlement discussions pertaining to the relative rights and obligations of the parties under the mortgage loan documents, including, but not limited to determining whether the parties can reach a mutually agreeable resolution to help the defendant avoid losing his or her home, and evaluating the potential for a resolution in which payment schedules or amounts may be modified or other workout options may be agreed to, and for whatever other purposes the Court deems appropriate"*.

29.   That plaintiff's commencement of the within foreclosure action in United States District Court, Southern District of New York, is a deliberate attempt to circumvent and avoid engagement in a settlement conference, pursuant to the directives imposed by CPLR 3408

**AS AND FOR A THIRD AFFIRMATIVE DEFENSE,
THE DEFENDANTS, DUNCAN JONES AND
<u>LINDA KNIGHT, ALLEGE HEREIN</u>:**

30.   At the time of the subject "Forbearance Agreement" referenced in plaintiff's Complaint, to have occurred on October 30, 2013, plaintiff Eastern Savings Bank, FSB regularly engaged in the making of mortgage loans, and was therefore subject to the Truth In Lending Act, as dictated by 15 U.S.C. § 1601 et Seq., as well as Federal Reserve Board Regulation Z, 12 C.F.R. § 226,  which implements the Act.

31.   In the course of the subject "Forbearance Agreement" between plaintiff Eastern Savings Bank, FSB and defendants Duncan Jones and Linda Knight (referenced within plaintiff's Complaint to have occurred on October 30, 2013), Eastern Savings Bank, FSB completely violated the applicable disclosure requirements set forth within the Truth In Lending Act, including those procedures dictated by Regulation Z § 226.19(b).

32.   That at no time prior to the "consummation" of the subject "Forbearance Agreement" relating to the herein referenced "Note" and "Mortgage" (or in connection therewith) did plaintiff Eastern Savings Bank, FSB provide the defendants, Duncan Jones and Linda Knight, with proper Truth In Lending Statement and/or Truth In Lending information, as mandated by the Truth In Lending Act, including 15 U.S.C. § 1640 and Regulation Z § 226.17.

33.   That at no time prior to the "consummation" of the subject "Forbearance Agreement" relating to the herein referenced "Note" and "Mortgage" (or in connection therewith) did plaintiff Eastern Savings Bank, FSB provide the defendants, Duncan Jones and Linda Knight with proper information concerning the loan's resultant **(i)** "Annual Percentage Rate"; **(ii)** "Finance Charge"; **(iii)** Amount Financed", or

**(iv)** proper information concerning the "Total Number of Payments" applicable to the subject loan, as mandated by the Truth In Lending Act, including 15 U.S.C. § 1640 and Regulation Z § 226.17.

34.   Because of Eastern Savings Bank, FSB having violated the applicable disclosure procedures set forth within the Truth In Lending Act, as implemented by Regulation Z, all of the language within the subject "Forbearance Agreement" is void, invalid, null and unenforceable; and plaintiff's claims are barred.

### AS AND FOR A FOURTH AFFIRMATIVE DEFENSE, THE DEFENDANTS, DUNCAN JONES AND <u>LINDA KNIGHT, ALLEGE HEREIN</u>:

35.   That the terms imposed by the subject "Forbearance Agreement" are unconscionable; and as such, all of the language within said "agreement" is void, invalid, null and unenforceable.

### AS AND FOR A FIFTH AFFIRMATIVE DEFENSE, THE DEFENDANTS, DUNCAN JONES AND <u>LINDA KNIGHT, ALLEGE HEREIN</u>:

36.   At the time of the subject consumer credit transaction referenced in plaintiff's Complaint, to have occurred on November 16, 2006, plaintiff Eastern Savings Bank, FSB regularly engaged in the making of mortgage loans, and was therefore subject to the Truth In Lending Act, as dictated by 15 U.S.C. § 1601 et Seq., as well as Federal Reserve Board

Regulation Z, 12 C.F.R. § 226, which implements the Act.

37. In the course of the subject consumer credit transaction between plaintiff Eastern Savings Bank, FSB and defendants Duncan Jones and Linda Knight (referenced within plaintiff's Complaint to have occurred on November 16, 2006), Eastern Savings Bank, FSB completely violated the applicable disclosure requirements set forth within the Truth In Lending Act, including those procedures dictated by Regulation Z § 226.19(b).

38. That at no time prior to the "consummation" of the subject consumer credit transaction between plaintiff Eastern Savings Bank, FSB and defendants Duncan Jones and Linda Knight (referenced within plaintiff's Complaint to have occurred on November 16, 2006), did plaintiff Eastern Savings Bank, FSB provide the defendants, Duncan Jones and Linda Knight, with proper Truth In Lending Statement and/or Truth In Lending information, as mandated by the Truth In Lending Act, including 15 U.S.C. § 1640 and Regulation Z § 226.17.

39. That at no time prior to the "consummation" of the subject consumer credit transaction between plaintiff Eastern Savings Bank, FSB and defendants Duncan Jones and Linda Knight (referenced within plaintiff's Complaint to have occurred on November 16, 2006), did plaintiff Eastern Savings Bank, FSB provide the defendants, Duncan Jones and Linda Knight with proper information concerning the subject loan's **(i)** "Annual Percentage Rate"; **(ii)**"Finance Charge"; **(iii)** Amount Financed"; **(iv)** proper information concerning the "Total Number of Payments", as mandated by the Truth In Lending Act, including 15 U.S.C. § 1640 and Regulation Z § 226.17.

40.   Because of Eastern Savings Bank, FSB having violated the applicable disclosure procedures set forth within the Truth In Lending Act, as implemented by Regulation Z, all of the language within the subject "Forbearance Agreement" is void, invalid, null and unenforceable; and plaintiff's claims are barred.


**AS AND FOR A SIXTH AFFIRMATIVE DEFENSE,
THE DEFENDANTS, DUNCAN JONES AND
<u>LINDA KNIGHT, ALLEGE HEREIN:</u>**


41.   That the damages to the plaintiff herein, were caused in whole or in part or were contributed to by the culpable conduct and want of care on the part of the plaintiff herein, and any such alleged damages should be fully or partially diminished by said culpable conduct and want of care, pursuant to New York State law, including CPLR Article 14-A.


**AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE,
THE DEFENDANTS, DUNCAN JONES AND
<u>LINDA KNIGHT, ALLEGE HEREIN:</u>**


42.   That the damages to the Plaintiff were caused in whole or in part or were contributed to by the culpable conduct and want of care on the part of the plaintiff herein; and any such alleged damages should be fully or partially diminished by said culpable conduct and want of care asserted by the plaintiff, in connection with processing and consummation of the subject mortgage loan transaction.

**AS AND FOR AN EIGHTH AFFIRMATIVE DEFENSE,
THE DEFENDANTS, DUNCAN JONES AND
LINDA KNIGHT, ALLEGE HEREIN:**

43.   That the plaintiff herein has failed to mitigate plaintiff's damages.

**AS AND FOR AN NINTH AFFIRMATIVE DEFENSE,
THE DEFENDANTS, DUNCAN JONES AND
LINDA KNIGHT, ALLEGE HEREIN:**

44.   That the failure of Eastern Savings Bank, FSB to provide the defendants,

Duncan Jones and Linda Knight with necessary and/or proper preliminary disclosures

concerning the payment terms imposed by the subject loan transaction, in connection

with both the consumer credit transaction between plaintiff Eastern Savings Bank, FSB

and defendants Duncan Jones and Linda Knight (referenced within plaintiff's Complaint

to have occurred on November 16, 2006); as well as the subject "Forbearance Agreement"

(referenced within plaintiff's Complaint to have occurred on or about October 30, 2013),

constituted a violation of the New York State Deceptive Acts and Practices Statute, as

codified by Section 349 of the New York State General Business Law; and as such, the

subject "Mortgage" and "Note", as well as the "Forbearance Agreement" are void, invalid,

null and unenforceable; and plaintiff's claims are barred.

## AS AND FOR AN TENTH AFFIRMATIVE DEFENSE, THE DEFENDANTS, DUNCAN JONES AND <u>LINDA KNIGHT, ALLEGE HEREIN</u>:

45.   That the failure of Eastern Savings Bank, FSB to provide the defendants, Duncan Jones and Linda Knight with necessary and/or proper preliminary disclosures concerning the payment terms imposed by the subject loan transaction, in connection with both the consumer credit transaction between plaintiff Eastern Savings Bank, FSB and defendants Duncan Jones and Linda Knight (referenced within plaintiff's Complaint to have occurred on November 16, 2006); as well as the subject "Forbearance Agreement" (referenced within plaintiff's Complaint to have occurred on or about October 30, 2013), constituted fraud; and as such, the subject "Mortgage" and "Note", as well as the "Forbearance Agreement" are void, invalid, null and unenforceable; and plaintiff's claims are barred.

**WHEREFORE**, the defendants, Duncan Eric Jones, a/k/a Duncan Jones and Linda L. Knight, demand judgment against the plaintiff, Eastern Savings Bank, FSB, denying plaintiff's causes of action raised within the subject Complaint, including plaintiff's cause of action for foreclosure, in its entirety, and awarding the defendants, Duncan Jones and Linda Knight, with costs, including reasonable attorney fees and disbursements in connection therewith.

Dated: Brooklyn, New York
          March 11, 2015

Yours, etc.


**DAVID I. PANKIN, P.C.**
Attorney for the Defendants
Duncan Eric Jones a/k/a
Duncan Jones & Linda L. Knight
Office & P.O. Address
48 Willoughby Street
Brooklyn, New York 11201
(718) 243-2444

_____
David I. Pankin, Esq.(2762)

EXHIBIT "1"

**#2014-030**

Also Terminates **OTS SE-09-015**

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY

| | |
|---|---|
| **In the Matter of:** ) | |
| ) | AA-EC-2014-21 |
| Eastern Savings Bank, FSB ) | |
| Hunt Valley, Maryland ) | |
| ) | |

### CONSENT ORDER

WHEREAS, the Comptroller of the Currency of the United States of America ("Comptroller" or "OCC"), through his authorized representative, has supervisory authority over Eastern Savings Bank, FSB, Hunt Valley, Maryland ("Bank");

WHEREAS, the Bank, by and through its duly elected and acting Board of Directors ("Board"), has executed a "Stipulation and Consent to the Issuance of a Consent Order," dated March __, 2014 ("Stipulation"), that is accepted by the Comptroller through his duly authorized representative; and

WHEREAS, by this Stipulation, which is incorporated by reference, the Bank, has consented to the issuance of this Cease and Desist Order ("Order") by the Comptroller.

NOW THEREFORE, pursuant to the authority vested in him by the Federal Deposit Insurance Act, as amended, 12 U.S.C. § 1818, the Comptroller hereby orders that:

ARTICLE I

COMPLIANCE COMMITTEE

(1)     Within ten (10) days of the date of this Order, the Board shall appoint and

maintain an active Compliance Committee of at least three (3) directors, of which at least two (2)

shall not be employees, former employees, or controlling shareholders of the Bank or any of its

affiliates (as the term "affiliate" is defined in 12 U.S.C. § 371c(b)(1) and 12 C.F.R. 223.2), or a

family member of any such person.  Upon the event of a change of the membership, the name of

any new member shall be immediately submitted in writing to the Director of Special

Supervision ("Director").  The Compliance Committee shall be responsible for monitoring and

coordinating the Bank's adherence to the provisions of this Order.

(2)     The Compliance Committee shall meet at least monthly and prepare a report as

described in paragraph (3) below.

(3)     Within thirty (30) days of the date of this Order, and by the end of every month

thereafter or within such other time period as the Director requires in writing, the Compliance

Committee shall submit a written progress report to the Board setting forth in detail:

      (a)     a description of the actions needed to achieve full compliance with each

           Article of this Order, Bank personnel responsible for implementing the

           corrective actions, and the timeframes for completion;

      (b)     actions taken to comply with each Article of this Order; and

      (c)     the results and status of those actions.

(4)     The Board shall forward a copy of the Compliance Committee's report, with any additional comments by the Board, to the Director within ten (10) days of receiving such report.

ARTICLE II

BOARD TO ENSURE EFFECTIVE AND QUALIFIED MANAGEMENT

(1)     By August 1, 2014, the Board shall ensure that the Bank has effective and qualified management in place on a full time basis in all senior executive officer positions to carry out the Board's policies, take the necessary steps to implement corporate governance and decision-making processes to correct the Bank's deficiencies in management, leadership, and Board oversight as described in the most recent Report of Examination ("most recent ROE"), and take the necessary steps to ensure compliance with applicable laws, rules, and regulations and  compliance with the Order.  At a minimum and by April 30, 2014, the Board, a committee thereof, or an independent third party reporting to the Board, shall perform an evaluation that addresses the following in a separate Management Report to the Board of Directors:

(a)     senior executive officers are capable of performing present and anticipated duties, factoring in each officer's past actual performance, experience, and qualifications, compared to their position description, duties and responsibilities, with particular emphasis on their proposed responsibilities to execute the Strategic Plan, achieve and maintain the minimum capital ratios required by Article IV of this Order, and correct the concerns raised in the most recent ROE;

(b)     identification of future senior executive management staffing requirements of each area of the Bank;

(c)     clear lines of responsibility and authority exist for each member of senior executive management, including but not limited to, the Chairman of the Board, Chief Executive Officer ("CEO"), President, Chief Credit Officer ("CCO"), and Chief Financial Officer ("CFO");

(d)     a management employment and succession program exist to promote the retention and continuity of capable management;

(e)     sufficient policies, processes, personnel, and control systems to effectively implement and adhere to all provisions of this Order;

(f)     Bank personnel have sufficient training and authority to execute their duties and responsibilities under this Order;

(g)     a process to evaluate, at least annually, the Bank's overall internal operations, staffing, Board and management oversight and information systems, policies, procedures, and other risk management systems with time sensitive strategies to address any deficiencies;

(h)     a process exists to ensure that management appropriately responds to any audit, compliance, and/or regulatory criticisms;

(i)     that the Board receives and reviews sufficient Bank information from management (including scope, frequency, and content) on the operation of the Bank and compliance with this Order to enable them to provide

4

oversight and fulfill their fiduciary duties and other responsibilities under law and as outlined in the OCC's "The Directors Book" and "Duties and Responsibilities of Directors" booklet (Section 501) of the *Comptroller's Handbook*; and

(j)     recommendations to correct or eliminate any other deficiencies in the supervision or organizational structure of the Bank, including the areas described in (1)(a) – (1)(i).

(2)     The Board shall perform and prepare an annual written performance appraisal for each Bank senior executive officer that evaluates his or her performance according to the position's description and responsibilities, adherence to the Strategic Plan, objectives established by the Board, and the effectiveness of developing and successfully implementing action plans to remedy issues raised in Reports of Examination ("ROE") or audit reports. If necessary and as appropriate, the Board shall engage a qualified independent third party to assist the Board in preparing the written performance appraisals. Each annual written performance appraisal also must address the following as it applies to each senior executive officer:

(a)     compliance with objectives established by the Board;

(b)     compliance with Board approved policies and procedures;

(c)     compliance with Board approved strategic and capital plans;

(d)     compliance with action plans to remedy issues raised in Reports of Examination or audit reports; and

(e)     compliance with laws, regulations, and regulatory guidance.

(3)     The Board shall ensure that the Bank addresses any deficiencies identified pursuant to paragraph (2) of this Article.

ARTICLE III

STRATEGIC PLAN

(1)     By no later than April 30, 2014, the Board shall prepare and forward to the Director for his review, pursuant to paragraph (2) of this Article, a written Strategic Plan for the Bank that is acceptable to the Director, covering at least a two (2) year period.  The Strategic Plan shall establish objectives for the Bank's overall risk profile, earnings performance, growth, balance sheet mix, off-balance sheet activities, liability structure, capital and liquidity adequacy, together with strategies to achieve those objectives, and shall, at a minimum, include:

(a)     a mission statement that forms the framework for the establishment of strategic goals and objectives;

(b)     employment of executive Bank officers that are capable of performing present and anticipated duties with updates to the Strategic Plan to account for any subsequent findings from Article II;

(c)     the strategic goals and objectives to be accomplished, including key financial indicators and risk tolerances;

(d)     an assessment of the Bank's strengths, weaknesses, opportunities, and threats that impact strategic goals and objectives;

(e)     an identification and prioritization of initiatives and opportunities, including timeframes that take into account the requirements of this Order;

(f)     a description of the Bank's targeted market(s) and competitive factors in its identified target market(s) and a description of control systems to mitigate risks in the Bank's markets;

(g)     an assessment of the present and planned product lines (assets and liabilities) and the identification of appropriate risk management systems to identify, measure, monitor, and control risks within the product lines;

(h)     assigned responsibilities and accountability for the strategic planning process; and

(i)     a description of systems and metrics designed to monitor the Bank's progress in meeting the Strategic Plan's goals and objectives.

(2) Prior to adoption by the Board, a copy of the Strategic Plan, and any subsequent amendments or revisions, shall be submitted to the Director for review and prior written determination of no supervisory objection.  At the next Board meeting following receipt of the Director's written determination of no supervisory objection, the Board shall adopt and the Bank, subject to Board review and ongoing monitoring, shall immediately implement and thereafter ensure adherence to the Strategic Plan.

(3)     The Bank may not initiate any action that deviates significantly from the Strategic Plan (that has received a no supervisory objection from the Director and that has been adopted by the Board) without a written determination of no supervisory objection from the Director.  The Board must give the Director at least thirty (30) days advance written notice of its intent to deviate significantly from the Strategic Plan, along with an assessment of the impact of such

change on the Bank's condition, including a profitability analysis and an evaluation of the adequacy of the Bank's organizational structure, staffing, management information systems, internal controls, and written policies and procedures to identify, measure, monitor, and control the risks associated with the change in the Strategic Plan.  For the purposes of this Article, changes that may constitute a significant deviation from the Strategic Plan include, but are not limited to, a change in the Bank's marketing strategies, products and services, marketing partners, underwriting practices and standards, credit administration, account management, collection strategies or operations, fee structure or pricing, accounting processes and practices, or funding strategy, any of which, alone or in the aggregate, may have a material impact on the Bank's operations or financial performance; or any other changes in personnel, operations, or external factors that may have a material impact on the Bank's operations or financial performance.

(4)    At least quarterly, the Board shall prepare a written evaluation of the Bank's performance against the Strategic Plan and shall include a description of the actions the Board will require the Bank to take to address any shortcomings, which shall be documented in the Board meeting minutes.  The Board shall forward a copy of these quarterly reports to the Director within ten (10) days of completion of its review.

(5)    The Board shall review and update the Strategic Plan at least annually, no later than July 31 each year, and more frequently if necessary or if requested by the Director in writing.

8

(6)     Until the Strategic Plan required under this Article has been submitted by the Bank for the Director's review, has received a written determination of no supervisory objection from the Director, and is being implemented by the Bank, the Bank shall not significantly deviate from the products, services, asset composition and size, funding sources, structure, operations, policies, procedures, and markets of the Bank that existed before this Order without first obtaining the Director's prior written determination of no supervisory objection to such significant deviation.  Any request to the Director for prior written determination of no supervisory objection to a significant deviation must be submitted to the Director at least thirty (30) days in advance of the significant deviation, along with an assessment of the impact of such change on the Bank's condition, including a profitability analysis and an evaluation of the adequacy of the Bank's organizational structure, staffing, management information systems, internal controls, and written policies and procedures to identify, measure, monitor, and control the risks associated with the change.

## ARTICLE IV

## CAPITAL PLAN AND HIGHER MINIMUMS

(1)     By no later than March 31, 2014, the Bank shall achieve and maintain at all times the following minimum capital ratios (as defined in 12 C.F.R. Parts 3 and 6):

      (a)     Tier 1 capital to adjusted total assets ratio at least equal to twelve percent (12%); and

      (b)     Total risk-based capital at least equal to eighteen percent (18%) of risk-weighted assets.

9

(2)      When the provisions of paragraph (3) below are met, the Bank shall achieve and maintain at all times the following minimum capital ratios (as defined in 12 C.F.R. Parts 3 and 6):

       (a)      Tier 1 capital to adjusted total assets ratio at least equal to ten percent (10%); and

       (b)      Total risk-based capital at least equal to twelve percent (12%) of risk-weighted assets.

(3)      The requirements of paragraph (2) of this Article shall apply, and shall supersede the minimum capital ratio requirements of paragraph (1) of this Article for those periods during which the Bank complies with the following:

       (a)      All loans past due greater than or equal to ninety (90) days plus all loans maintained on nonaccrual plus all Other Real Estate Owned ("OREO") as a percentage of Tier 1 capital plus the Allowance for Loan and Lease Loss ("ALLL") account is less than or equal to one hundred percent (100%);

       (b)      The Bank has received a supervisory no objection from the Director on the Strategic and Capital Plans and the Bank is in compliance with that Strategic Plan; and

       (c)      The Bank has received confirmation from the Director that no significant deviation from the Bank's Strategic Plan exists as determined by the OCC via an evaluation of compliance with Article III.

(4)     The requirement in this Order to meet and maintain a specific capital level means that the Bank may not be deemed to be "well-capitalized" for purposes of 12 U.S.C. 1831o and 12 C.F.R. Part 6, pursuant to 12 C.F.R. 6.4 (b)(1)(iv).

(5)     Within sixty (60) days of the date of this Order, the Board shall develop, document, and implement an effective internal capital planning process consistent with OCC Bulletin 2012-16, "Guidance for Evaluating Capital Planning and Adequacy" (June 7, 2012). The Board shall review the documented capital planning process at least annually or more frequently if requested by the Director in writing.

(6)     Within sixty (60) days of the date of this Order, the Board shall forward to the Director for his review, pursuant to paragraph (9) of this Article, a written Capital Plan for the Bank, consistent with the Strategic Plan pursuant to Article II, covering at least a two (2) year period.  The written Capital Plan shall, at a minimum:

    (a)     include specific plans for the achievement and maintenance of adequate capital, which shall in no event be less than the requirements of paragraph (1) or (2), as applicable, of this Article;

    (b)     identify and evaluate all material risks;

    (c)     determine the Bank's capital needs in relation to material risks and strategic direction;

    (d)     identify and establish a strategy to maintain capital adequacy and strengthen capital if necessary and establish a contingency capital plan commensurate with the Bank's overall risk and complexity;

(e)     include detailed quarterly financial projections; and

(f)     include specific plans detailing how the Bank will comply with restrictions or requirements set forth in this Order that will have an impact on the Bank's capital.

(7)     If the Bank's written Capital Plan outlines a sale or merger of the Bank, the written Capital Plan shall address the steps that will be taken and the associated timeline, to ensure that within ninety (90) days after the receipt of the Director's written determination of no supervisory objection to the written Capital Plan, a definitive agreement for the sale or merger is executed.

(8)     The Bank may declare or pay a dividend or make a capital distribution only:

(a)     when the Bank is in compliance with its approved Capital Plan and would remain in compliance with its approved Capital Plan immediately following the declaration or payment of any dividend or capital distribution;

(b)     when the Bank is in compliance with 12 C.F.R. §§ 163.140 - 163.146; and,

(c)     the Bank has received a prior written determination of no supervisory objection from the Director.

(9)     Prior to adoption by the Board, a copy of the Bank's written Capital Plan shall be submitted to the Director for prior written determination of no supervisory objection. The Board shall review and update the Bank's written Capital Plan at least annually, no later than July

31each year, and more frequently if required by the Director in writing. Revisions to the Bank's written Capital Plan shall be submitted to the Director for a prior written determination of no supervisory objection. At the next Board meeting following receipt of the Director's written determination of no supervisory objection, the Board shall thereafter adopt and the Bank, subject to Board review and ongoing monitoring, shall immediately implement and thereafter ensure adherence to the written Capital Plan and any amendments or revisions thereto.

(10)   At least quarterly, the Board shall review financial reports and earnings analyses to evaluate the Bank's performance against the goals and objectives established in the written Capital Plan, as well as the Bank's written evaluation of significant differences between the actual and projected balance sheet, income statement, and expense accounts, including descriptions of extraordinary and/or nonrecurring items. This review shall include a description of the actions the Board will require the Bank to take to address any deficiencies. The quarterly reviews and written evaluations shall be documented in the Board meeting minutes. The Board shall retain a copy of these reviews and Board meeting minutes and shall forward a copy of these written evaluations and Board meeting minutes to the Director within forty-five (45) days after the end of each calendar quarter.

(11)   If the Bank fails to maintain capital ratios required by paragraphs (1) through (2) of this Article or fails to implement an acceptable written Capital Plan to which the Director has provided a written determination of no supervisory objection, then the Bank may, in the Director's sole discretion, be deemed undercapitalized for purposes of this Order. The Bank shall take such corrective measures as the OCC may direct in writing from among the provisions

13

applicable to undercapitalized depository institutions under 12 U.S.C. § 1831o(e) and 12 C.F.R.

Part 6.  For purposes of this requirement, an action "necessary to carry out the purpose of this

section" under 12 U.S.C. § 1831o(e)(5) shall include restoration of the Bank's capital to the

minimum ratios required by paragraph (1) of this Article, and any other action deemed necessary

by the OCC to address the Bank's capital deficiency or the safety and soundness of its

operations.

ARTICLE V

PROBLEM ASSET REDUCTION PLAN

(1)      Within sixty (60) days of the date of this Order, the Board shall adopt and the

Bank, subject to Board review and ongoing monitoring, shall immediately implement and

thereafter ensure Bank adherence to a revised Problem Asset Reduction Plan ("PARP"), which

shall be designed to eliminate the basis of criticism of assets criticized in the most recent ROE, in

any subsequent ROE, by any internal or external loan review, or in any list provided to

management by OCC Examiners during any examination as "doubtful," "substandard," or

"special mention."  The PARP shall include, at a minimum:

(a)      targets for the level of criticized assets as a percentage of Tier 1 capital
plus the ALLL and the timeframes for each such target;

(b)      a description of the methods for reducing the level of criticized assets to
the established targets;

(c)      sufficient staff with the qualifications, skills, and experience to effectively
manage and resolve problem assets;

14

    (d)    adequate management information systems to measure the status of

        problem assets; and

    (e)    the development of Problem Asset Reports ("PARs") identifying all credit

        relationships and other assets totaling in aggregate five hundred  thousand

        dollars ($500,000) or more, criticized as "doubtful," "substandard," or

        "special mention."  The PARs must be updated and submitted to the

        Board, or a committee thereof, monthly and the Director quarterly.

(2)    Each PAR shall cover an entire credit relationship and include, at a minimum, analysis and documentation of the following:

    (a)    the origination date and any renewal or extension dates, amount, purpose

        of the loan, and the originating and current loan officer(s);

    (b)    the expected primary and secondary sources of repayment, and an analysis

        of the adequacy of the repayment source;

    (c)    the appraised value of supporting collateral and the position of the Bank's

        lien on such collateral, where applicable, as well as other necessary

        documentation to support the current collateral valuation;

    (d)    an analysis of current and complete credit information, including global

        cash flow analysis where loans are to be repaid from operations;

    (e)    results of an impairment analysis as required under Accounting Standards

        Codification ("ASC") 310-10 (formerly Financial Accounting Standards

        ("FAS") Statement No. 114);

(f)     accurate risk ratings consistent with the classification standards contained in the "Rating Credit Risk" booklet of the *Comptroller's Handbook*;

(g)     appropriate accrual status pursuant to the Federal Financial Institutions Examination Council ("FFIEC") Instructions for the Preparation of Consolidated Reports of Condition and Income;

(h)     significant developments, including a discussion of changes since the prior PAR, if any; and

(i)     the proposed action to eliminate the basis of criticism and the timeframe for its accomplishment, including, if appropriate, an exit strategy.

(3)     The Bank shall not extend credit, directly or indirectly, including renewals, modifications, or extensions, to borrowers whose loans or other extensions of credit are subject to a PAR, or are criticized in any ROE, in any internal or external loan review, or in any list provided to management by OCC Examiners during any examination, unless and until a majority of the Board or a designated committee thereof, determines in writing that each of the following conditions for loans or extensions of credit totaling in the aggregate five hundred thousand dollars ($500,000) or more is met:

(a)     the extension of additional credit is necessary to promote the best interests of the Bank;

(b)     the Bank has performed a written credit and collateral analysis as required by paragraphs (2)(c) and (2)(d) of this Article and, if necessary, the

proposed action referred to in paragraph (2)(i) of this Article is revised, as

appropriate;

(c)     the Board's formal plan to collect or strengthen the criticized asset will

not be compromised by the extension of additional credit; and

(d)     a copy of the findings and approval of the Board or designated

committee thereof shall be maintained in the credit file of the affected

borrower.

(4)     At least quarterly, the Board or a designated committee thereof, shall review and evaluate the effectiveness of the PARP and the PARs.  The Board's review shall include an assessment of the Bank's compliance with the PARP and the PARs.  Written documentation of the factors considered and conclusions reached by the Board in determining the Bank's compliance and progress in reducing the level of problem assets shall be maintained.

## ARTICLE VI

## LOAN MODIFICATION/ TROUBLED DEBT RESTRUCTURE PROCEDURES

(1)     Within thirty (30) days of the date of this Order, the Board shall adopt written

policies and procedures providing guidance for the treatment of residential real

estate loan modifications such that modifications are undertaken in a manner that,

consistent with safe and sound practices and regulatory and accounting

guidelines, improves the likelihood that a borrower can repay the restructured

credit under the modified terms and in accordance with a reasonable repayment

schedule within a reasonable period of time.

(2)     The policy must require the Bank to take steps to ensure verification of income within a reasonable timeframe (e.g., thirty (30) days), documenting that any decision to grant a long-term modification is based on information that demonstrates the borrower's continued ability to make the modified payments for the foreseeable future.

(3)     The policy must require analysis to determine if restructured loans should be reported as a Troubled Debt Restructure ("TDR") consistent with the guidance provided in OCC Bulletin 2012-10, "Troubled Debt Restructurings Supervisory Guidance on Accounting and Reporting Requirements" (April 5, 2012), OCC Bulletin 2013-26, "Guidance on Certain Issues Related to Troubled Debt Restructurings" (October 24, 2013),  and the Bank Accounting Advisory Series (September 2013).

## ARTICLE VII

## ALLOWANCE FOR LOAN AND LEASE LOSSES

(1)     Within thirty (30) days of the date of this Order, the Board shall adopt written

policies and procedures for maintaining an adequate ALLL in accordance with

U.S. Generally Accepted Accounting Principles ("GAAP").  The ALLL policies

and procedures shall be consistent with the guidance set forth in the FFIEC's

"Interagency Policy Statement on the Allowance for Loan and Lease Losses"

dated December 13, 2006 (OCC Bulletin 2006-47) ("Interagency Statement") and

"Policy Statement on Allowance for Loan and Lease Losses Methodologies and

Documentation for Banks and Savings Institutions" dated July 20, 2011 (OCC

Bulletin 2001-37) ("Policy Statement"), and shall at a minimum include:

18

(a)     procedures for determining whether a loan is impaired and measuring the

        amount of impairment, consistent with GAAP (including FASB ASC 310-

        10, Receivables - Overall - Subsequent Measurement – Impairment);

(b)     procedures for segmenting the loan portfolio and estimating loss on groups

        of loans that are consistent with GAAP (including FASB ASC 450-20,

        Loss Contingencies).  These procedures shall require the Bank to

        document its estimation of credit losses and its analysis of the nine

        qualitative factors set forth in the Interagency Statement;

(c)     procedures for validating the ALLL methodology;

(d)     support for each of the qualitative factor adjustments and impairment

        analysis calculations included in the written analysis;

(e)     a process for summarizing and documenting, for the Board's prior review

        and approval, the amount to be reported in the Consolidated Reports of

        Condition and Income ("Call Reports") for the ALLL; and

(f)     a description of the individuals responsible and methodology used to

        determine the ALLL.

(2)     Within thirty (30) days of the date of this Order, the Board shall adopt written

policies and procedures to ensure that all official and regulatory reports filed by the Bank

accurately reflect an adequate ALLL balance as of the date that such reports are submitted. Any

difference between the ALLL balance as determined by the analysis required by this Article and

the Bank's actual ALLL balance shall be remedied through appropriate account adjustments in the quarter it is discovered, prior to the filing of the Call Reports.

(3)     Upon adoption, the Board shall submit a copy of the policies and procedures required by this Article, or any subsequent amendments or changes to those policies and procedures, to the Director for determination of no supervisory objection. Upon receiving a determination of no supervisory objection from the Director, the Board shall implement and thereafter ensure adherence to the policies and procedures.

## ARTICLE VIII

## RISK RATING AND NONACCRUAL RECOGNITION

(1)     Effective upon the date of this Order, the Board shall ensure that the risk associated with the Bank's loans and other assets is properly reflected and accounted for on the Bank's books and records and the Bank properly recognizes income.

(2)     Within sixty (60) days, the Board shall implement and adhere to a written program, which at a minimum shall:

   (a)     use a risk grading system that is consistent with and reconcilable to OCC Bulletin 2004-20, "Uniform Agreement on the Classification of Assets and Appraisal of Securities Held By Banks and Thrifts" dated June 15, 2004 and OCC Bulletin 2000-20 "Interagency Uniform Retail Credit Classification and Account Management Policy" dated September 8, 2000, where applicable;

20

(b)      be consistent with the guidelines set forth in the "Rating Credit Risk" Booklet of the *Comptroller's Handbook*;

(c)      incorporate a process to ensure risk ratings are assigned by lending officers on a timely basis and are accurate based on receipt and analysis of current and satisfactory financial and collateral information;

(d)      incorporate a process to ensure the Bank's loans and other assets are timely placed on nonaccrual where appropriate in accordance with the Instructions for Consolidated Reports of Income and Condition ("Call Report Instructions");

(e)      require that appropriate analysis and documentation is maintained in the credit files to support the current and previous risk rating and accrual determination for each credit relationship; and

(f)      incorporate management information systems that periodically provide feedback to the Board about the effectiveness of the program from senior management and the individual lending officers.

(3)      Upon adoption, the Board shall forward a copy of the written program adopted pursuant to this Article to the Director.

21

ARTICLE VIX

<u>LOAN REVIEW</u>

(1)        Within sixty (60) days of the date of this Order, the Board shall adopt, and the

Bank, subject to Board review and ongoing monitoring, shall implement and thereafter ensure

adherence to an effective, independent, and ongoing independent loan review program to review,

at least quarterly, the Bank's loan and lease portfolios, to assure the timely identification and

categorization of problem credits.  The program shall provide for a written report to be filed with

the Board or committee thereof promptly after each review and shall employ a loan and lease

rating system consistent with the guidelines set forth in the "Rating Credit Risk" and "Allowance

for Loan and Lease Losses," booklets of the *Comptroller's Handbook*.  Such written reports shall

include, at a minimum, conclusions regarding the following:

       (a)     the loan review scope and coverage parameters;

       (b)     the overall quality of the loan and lease portfolios;

       (c)     the overall underwriting and approval process;

       (d)     the overall credit administration process;

       (e)     the volume and types of concentrations of credit and corresponding

              internal risk management;

       (f)     the identification, type, rating, and amount of problem loans and leases;

       (g)     the identification and amount of delinquent and nonaccrual loans and

              leases;

22

(h)   loans and leases to the directors, executive officers, and principal shareholders of the Bank and to their related interests;

(i)   credit underwriting and collateral documentation exceptions;

(j)   credit analysis and documentation of such analysis;

(k)   accuracy of internal risk ratings;

(l)   completeness and effectiveness of problem loan workout plans;

(m)   the independence and appropriateness of the collateral valuation process;

(n)   the accuracy of the Bank's recognition of troubled debt restructurings;

(o)   the identity of the loan officer(s) of each of the loans reported in accordance with subparagraphs (b) through (h);

(p)   the identification and status of credit-related violations of law, rule, or regulation;

(q)   adequacy of the Bank's Allowance for Loan and Lease Losses; and

(r)   loans and leases and other extensions of credit in nonconformance with the Bank's lending and leasing policies, and exceptions to the Bank's lending and leasing policies.

(2)   The Board shall evaluate the loan and lease review report(s), upon receipt, and shall ensure that the Bank takes immediate, adequate, and continuing remedial action, as appropriate, upon all findings noted in the report(s).  At least quarterly, the Bank shall provide written reports to the Board on the remedial actions taken by the Bank regarding findings noted

23

in the loan review report(s).  The Board shall also ensure that the Bank preserves documentation of any actions taken by the Bank to collect or strengthen assets identified as problem credits.

## ARTICLE X

## OTHER REAL ESTATE OWNED

(1)     Within thirty (30) days of the date of this Order, the Board shall adopt, implement, and thereafter ensure Bank adherence to a policy to ensure that OREO is managed in accordance with 12 C.F.R. §§ 167.1 and 167.5.  The policy shall address:

      (a)     responsibility and authority for the Bank's OREO properties;

      (b)     proper accounting procedures for the Bank's OREO properties to be employed from the time of transfer to the Bank until and upon sale to a third party;

      (c)     procedures to require timely appraisals of the Bank's OREO properties pursuant to 12 C.F.R. §§ 167.1 and 167.5;

      (d)     diligent efforts to sell OREO property; and

      (e)     reporting systems.

(2)     Within ninety (90) days of the date of this Order, the Board shall adopt, implement, and thereafter ensure Bank adherence to action plans for each parcel of OREO to ensure that these assets are managed in accordance with 12 C.F.R. §§ 167.1 and 167.5.  At a minimum, the plans shall:

      (a)     identify the Bank officer(s) responsible for managing and authorizing transactions relating to the OREO properties;

(b)     contain an analysis of each OREO property which compares the cost to

carry against the financial benefits of near term sale;

(c)     detail the marketing strategies for each parcel;

(d)     identify targeted time frames for disposing each parcel of OREO;

(e)     establish targeted write-downs at periodic intervals if marketing strategies

are unsuccessful;

(f)     establish procedures to require periodic market valuations of each

property, and the methodology to be used; and

(g)     provide for reports to the Board on the status of OREO properties on at

least a quarterly basis.

ARTICLE XI

APPRAISAL MANAGEMENT PRACTICES

(1)     Within thirty (30) days of the date of this Order, the Board shall obtain a current

appraisal or evaluation, as applicable, of the real estate securing each of the loans lacking an

appropriate appraisal or evaluation.

(2)     Within thirty (30) days of the date of this Order, the Board shall revise written

policies and procedures governing the Bank's valuation of real estate collateral to ensure the

safety and soundness of the Bank's real estate lending activities.  The Bank's policies and

procedures shall be consistent with OCC Bulletin 2010-42, "Interagency Appraisal and

Evaluation Guidelines," dated December 10, 2010, and at a minimum must include:

25

(a)    a requirement that the Bank will obtain an appraisal or perform an appropriate evaluation, as applicable, for all real-estate-related financial transactions, consistent with the standards and requirements in 12 C.F.R. Part 34, Subpart C (which sets forth standards for when the Bank will reevaluate or reappraise real estate collateral to support timely problem loan identification, work-out strategies, identification of impairment, and impact to the ALLL, and includes requirements distinguishing when an appraisal, as opposed to an evaluation, will be required under certain circumstances);

(b)    an effective appraisal and evaluation review process, consistent with Section XV of the "Interagency Appraisal and Evaluation Guidelines"; and

(c)    criteria for obtaining appraisals or performing evaluations for transactions that are not otherwise covered by regulatory requirements.

ARTICLE XII

LIQUIDITY PLAN

(1)    Within fifteen (15) days of the date of this Order, the Board or designated committee shall revise, adopt, and implement a liquidity policy that results in adherence to a comprehensive liquidity risk management program ("Program"). This Program must include assessing, on an ongoing basis, the Bank's current and projected funding needs and ensuring that sufficient funds or access to funds exist to meet those needs and is appropriate in light of the

26

Bank's risk profile, Strategic and Capital Plans and the "Liquidity" booklet of the *Comptroller's Handbook* (June 2012).  This Program must also include a contingency funding plan ("CFP") that allows the Bank to operate with adequate liquidity in the event of extraordinary demands against its funding base. At a minimum, the CFP shall be consistent with the guidance outlined in the Liquidity booklet (June 2012) of the *Comptroller's Handbook*.

## ARTICLE XIII

## ENGAGEMENT OF THIRD PARTIES

(1)    The Bank shall not renew or enter into new contracts or engagements with a third party company, entity, or person for services (including, but not limited to, internal audit, interest rate risk management, loan review, liquidity risk management, information technology, or financial) for, or on behalf of, the Bank unless the engagements are in compliance with OCC Bulletin 2013-29, "Third Party Relationships: Risk Management Guidance" (Oct. 30, 2013).

(2)    The Bank must routinely monitor and document its review of the performance and activities of each third party, including ensuring that committed goods and services are received, that the third party is in compliance with the written contract, and that the third party remains a viable provider of services.  The Board shall immediately take appropriate action if the third party is not complying with the written contract or engagement and shall maintain documentation of any such action.

ARTICLE XIV

<u>THIRD PARTY CONTRACTS INVOLVING SALE, MERGER,<br>OR RECAPITALIZATION</u>

(1)     The Bank shall not enter into any contract with a third party to assist in the sale, merger, or recapitalization of the Bank that requires the payment of anything other than expenses prior to such sale, merger, or recapitalization, or that requires the Bank to pay, directly or indirectly, the cost of performing due diligence, or other services related to the transaction, unless the Bank first receives the Director's written determination of no supervisory objection.

(2)     Any request for the Director's written determination of no supervisory objection shall include:

     (a)     the Board's written analysis of why the proposed contract is in the best interests of the Bank;

     (b)     a description of the due diligence credit review, fairness opinion, or any other services to be performed by the third party, including a copy of the proposed contract or engagement;

     (c)     a description of the Bank's due diligence process for agreeing to the services to be performed by a potential purchaser or merger partner; and

     (d)     a determination by the Board that:

          (i)     the activities to be performed by the third party as part of the sale or merger requirements are fair and reasonable to the Bank;

          (ii)     the parties are able to perform under the contract or commitment;

28

      (iii)      the fees the Bank is required to pay to the third party are

              reasonable for the services provided; and

      (iv)      the contract is in the best interests of the Bank.

(3)      Following any written determination of no supervisory objection by the Director, the Board shall regularly monitor the contractor or service provider's performance to ensure that the contractor or service provider is complying with the written contract or engagement.  The Board shall immediately take appropriate action if the contractor or service provider is not complying with the written contract or engagement and shall maintain documentation of any such items.

## ARTICLE XV

## VIOLATIONS OF LAW

(1)      The Board shall require and the Bank shall immediately take all necessary steps to correct each violation of law, rule, or regulation cited in the most recent ROE or any subsequent ROE, or brought to the Board's or Bank's attention in writing by management, regulators, auditors, loan review, or other compliance efforts.  Within sixty (60) days after the violation is cited or brought to the Board's or Bank's attention, the Bank shall provide to the Board a list of any violations that have not been corrected.  This list shall include an explanation of the actions taken to correct the violation, the reasons why the violation has not yet been corrected, and a plan to correct the violation by a specified date.

(2)      The monthly progress reports required by Article I of this Order shall include the date and manner in which each correction has been effected during that reporting period.

29

(3)     Within sixty (60) days of the date of this Order, the Board shall adopt and the Bank, subject to Board review and ongoing monitoring, shall implement and thereafter ensure adherence to:

        (a)     specific procedures to prevent violations cited in the most recent ROE; and

        (b)     general procedures addressing compliance management that incorporate internal control systems and education of employees regarding laws, rules, and regulations applicable to their areas of responsibility.

(4)     Upon adoption, a copy of these procedures shall be forwarded to the Director.

ARTICLE XVI

OTHER PROVISIONS

(1)     Although the Bank is by this Order required to submit certain proposed actions and programs for the review or prior written determination of no supervisory objection of the Director, the Board has the ultimate responsibility for proper and sound management of the Bank and the completeness and accuracy of the Bank's books and records.

(2)     It is expressly and clearly understood that if, at any time, the Comptroller deems it appropriate in fulfilling the responsibilities placed upon it by the several laws of the United States of America to undertake any action affecting the Bank, nothing in this Order shall in any way inhibit, estop, bar or otherwise prevent the Comptroller from so doing.

(3)     Each citation or referenced guidance included in this Order includes any subsequent guidance that replaces, supersedes, amends, or revises the cited law, regulation, or guidance.

(4)     The provisions of this Order are effective upon issuance by the Comptroller, through his authorized representative whose hand appears below, and shall remain effective and enforceable, except to the extent that, and until such time as, any provisions of this Order shall have been amended, suspended, waived, or terminated in writing by the Comptroller, through his authorized representative.

(5)     Except as otherwise expressly provided herein, any time limitations imposed by this Order shall begin to run from the effective date of this Order.

(6)     If the Bank requires a waiver or suspension of any provision or an extension of any timeframe within this Order, the Board shall submit a written request to the Director asking for relief.  Any written requests submitted pursuant to this Article shall include a statement setting forth in detail, with relevant supporting documentation, the special facts and circumstances that support the waiver or suspension of any provision or an extension of a timeframe within this Order.

(7)     The Director's decision concerning a request submitted pursuant to paragraph (6) of this Article is final and not subject to further review.

(8)     In each instance in this Order in which the Board or a Board committee is required to ensure adherence to and undertake to perform certain obligations of the Bank, it is intended to mean that the Board shall:

31

(a)     ensure that the Bank has sufficient processes, management, personnel, and control systems to ensure implementation of and adherence to this Order, and that Bank management and personnel have sufficient training and authority to execute their duties under this Order;

(b)     authorize and adopt such actions on behalf of the Bank as may be necessary for the Bank to perform its obligations and undertakings under the terms of this Order;

(c)     require the timely reporting by Bank management of such actions directed by the Board to be taken under the terms of this Order;

(d)     follow-up on any non-compliance with such actions in a timely and appropriate manner; and

(e)     require corrective action be taken in a timely manner for any non-compliance with such actions.

(9)     This Order is intended to be, and shall be construed to be, a final order issued pursuant to 12 U.S.C. § 1818(b), and expressly does not form, and may not be construed to form, a contract binding on the Comptroller or the United States.

(10)     The Office of Thrift Supervision ("OTS") issued a Cease and Desist Order to the Bank on February 20, 2009, OTS Order No. SE-09-015.  This Order replaces the OTS Order No. SE-09-015 in its entirety and, therefore, OTS Order No. SE-09-015 is hereby terminated. Provided however, no provision in this Order shall bar or otherwise limit any enforcement action

the OCC may choose to initiate, in its discretion, against the Bank or its institution-affiliated parties for any failure to comply with the OTS Order No. SE-09-015 while it was effective.

(11)   All reports or plans which the Bank or Board has agreed to submit to the Director pursuant to this Order shall be forwarded, by overnight mail or via email, to the following:

| | |
|---|---|
| Director for Special Supervision<br>Comptroller of the Currency<br>400 7th Street, S.W., Suite 3E-218<br>Mail Stop 8E-12<br>Washington, D.C. 20219 | Assistant Deputy Comptroller<br>Washington DC Field Office<br>Comptroller of the Currency<br>400 7th Street, S.W., MS 2W-11<br>Washington, D.C. 20219 |

(12)   The terms of this Order, including this paragraph, are not subject to amendment or modification by any extraneous expression, prior agreements, or prior arrangements between the parties, whether oral or written.

IT IS SO ORDERED, this 31st day of March, 2014.


/s_____
James R. Moore
Director for Special Supervision

33

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
COMPTROLLER OF THE CURRENCY

| | | |
|---|---|---|
| **In the Matter of:** | ) | |
| | ) | AA-EC-2014-21 |
| Eastern Savings Bank, FSB | ) | |
| Hunt Valley, Maryland | ) | |
| | ) | |

## STIPULATION AND CONSENT TO THE ISSUANCE
## OF A CONSENT ORDER

**WHEREAS,** the Comptroller of the Currency of the United States of America

("Comptroller") intends to initiate cease and desist proceedings against Eastern Savings Bank,

FSB, Hunt Valley, Maryland ("Bank") pursuant to 12 U.S.C. § 1818(b), through the issuance of

a Notice of Charges, for unsafe or unsound banking practices relating to the continuing critically

deficient condition of the Bank stemming from weak risk management practices, a continuing

high level of credit risk and a high level of classified loans and assets, new Matters Requiring

Attention identified during the 2013 full scope examination, and for failure to comply with the

February 20, 2009 Cease and Desist Order.

**WHEREAS,** the Bank, in the interest of compliance and cooperation, and without

admitting or denying any wrongdoing, consents to the issuance of a Consent Order, dated March

31, 2014 ("Order") by executing this Stipulation and Consent to the Issuance of a Consent Order;

**NOW THEREFORE,** in consideration of the above premises, the Comptroller, through

his authorized representative, and the Bank, through its duly elected and acting Board of

Directors, hereby stipulate and agree to the following:

## ARTICLE I

### Jurisdiction

(1) The Bank is a "federal savings association" within the meaning 12 U.S.C. § 1462(f), which was chartered and examined by the Office of Thrift Supervision ("OTS") pursuant to the Home Owners' Loan Act, as amended, 12 U.S.C. § 1461 *et seq.*

(2) Pursuant to Title III of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, 124 Stat. 1376 (2010), all functions of the OTS related to federal savings associations were transferred to the Comptroller.[1]

(3)      The Comptroller is "the appropriate Federal banking agency" regarding the Bank pursuant to 12 U.S.C. §§ 1813(q) and 1818(b).

(4)      The Bank is an "insured depository institution" within the meaning of 12 U.S.C. §§ 1813(c) and 1818(b)(1).

## ARTICLE II

### Agreement

(1) The Bank agrees that said Order shall be deemed an "order issued with the consent of the depository institution" as defined in 12 U.S.C. § 1818(h)(2), and consents and agrees that said Order shall become effective upon its issuance and shall be fully enforceable by the Comptroller under the provisions of 12 U.S.C. § 1818(i).  Notwithstanding the absence of mutuality of obligation, or of consideration, or of a contract, the Comptroller may enforce any of  commitments or obligations herein undertaken by the Bank under his supervisory powers, including 12 U.S.C. § 1818(i), and not as a matter of contract law.  The Bank expressly

---

[1] *See* Dodd-Frank Act § 312(b), 12 U.S.C. § 5412.

acknowledges that neither the Bank nor the Comptroller has any intention to enter into a contract.

(2)     The Bank also expressly acknowledges that no officer or employee of the Comptroller has statutory or other authority to bind the United States, the U.S. Treasury Department, the Comptroller, or any other federal bank regulatory agency or entity, or any officer or employee of any of those entities to a contract affecting the Comptroller's exercise of his supervisory responsibilities.

<u>Waivers</u>

(1)     The Bank, by signing this Stipulation and Consent, hereby waives:

the issuance of a Notice of Charges pursuant to 12 U.S.C. § 1818(b);

any and all procedural rights available in connection with the issuance of  the Order;

all rights to a hearing and a final agency decision pursuant to

12 U.S.C. § 1818(i), 12 C.F.R. Part 19;

all rights to seek any type of administrative or judicial review of the        Order; and

any and all rights to challenge or contest the validity of the Order.

<u>Other Action</u>

(1)     The Bank agrees that the provisions of this Stipulation and Consent shall not inhibit, estop, bar, or otherwise prevent the Comptroller from taking any other action affecting

3

the Bank if, at any time, it deems it appropriate to do so to fulfill the responsibilities placed upon it by the several laws of the United States of America.

IN TESTIMONY WHEREOF, the undersigned, authorized by the Comptroller as his representative, has hereunto set his hand on behalf of the Comptroller.

/s                                                          3/31/2014
_____        _____
James R. Moore                                      Date
Director for Special Supervision

4

IN TESTIMONY WHEREOF, the undersigned, as the duly elected and acting Board of

Directors of the Bank, have hereunto set their hands on behalf of the Bank.

/s                                                                      3/31/2014
_____          _____
Alan E. Berkowitz                                          Date

                                                                       3/31/2014

/s
_____          _____
Howard K. Cohen                                          Date

                                                                       3/31/2014

/s
_____          _____
David C. Daneker                                          Date

                                                                       3/31/2014

/s
_____          _____
Howard M. Friedel                                        Date

                                                                       3/31/2014

/s
_____          _____
Beth H. Goldsmith                                        Date

                                                                       3/31/2014

/s
_____          _____
Yaakov S. Neuberger                                    Date

                                                                       3/31/2014

/s
_____          _____
Solomon S. Spetner                                      Date

                                                                       3/31/2014

/s
_____          _____
Barry H. Stern                                              Date

5

## AFFIRMATION OF SERVICE

**DAVID I. PANKIN, ESQ.,** an attorney duly admitted to practice law before the Courts of the State of New York, affirms the following under penalty of perjury, pursuant to C.P.L.R. 2106.

1.  That I am the attorney for the defendants, Duncan Eric Jones a/k/a Duncan Jones and Linda L. Knight.

2.  That on March 11, 2015, I served the within ANSWER on the following parties: **(i)** Kriss & Feuerstein, LLP, Attorneys for the Plaintiff, Eastern Savings Bank, FSB, 360 Lexington Avenue, Suite 1200, New York, NY 10017 (by regular mail and electronic filing; **(ii)** New York City Environmental Control Board, Pro-Se Defendant, 66 John Street, New York, NY 10038, by depositing true copies of same enclosed in postpaid properly addressed wrappers, in an official depository under the exclusive care and custody of the United States Post Office Department, within the State of New York.

Dated:  Brooklyn, New York
        March 11, 2015

                                              _____
                                         David I. Pankin, Esq.(2762)